ANDRESKI, Appellant, vs. INDUSTRIAL COMMISSION and another, Respondents.*

*February 8—March 4, 1952.*

---

* Motion for rehearing denied, without costs, on May 6, 1952.

*R. W. Peterson* of Madison, for the appellant.

For the respondent Industrial Commission there were briefs by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

On the motion for rehearing, a brief was also filed by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb, Kurt H. Frauen,* and *Reuben W. Peterson, Jr.,* of counsel, all of Milwaukee, as *amici curiae.*

BROWN, J.   Joseph Andreski was sheriff of Marathon county. On the morning of November 28, 1948, the sheriff worked in his office until approximately 10:45 a. m.   His

undersheriff had planned to go deer hunting that day but Andreski asked him to postpone it because he, Andreski, had work to do. The sheriff then left the office without indicating in any way what he was going to do and did not again communicate with it or make any other official communication with anyone, so far as is known, during his lifetime. The county did not provide him with an automobile but required him to supply one for himself and one for his undersheriff and he drove away from the sheriff's office in the automobile which he owned and which he used on official business. About 2:30 p. m. he entered France's tavern on the outskirts of Wausau. There is no direct testimony about his actions there until the proprietor came in about 5:30 p. m. Andreski had patronized the tavern from time to time for recreation and now France invited him to have supper with him. The sheriff declined, saying he had too much to do. Andreski had no refreshments of any kind during the time he was with France. France testified that Mrs. France said that she had served him earlier but did not state the number or the kind of drinks. Andreski and France talked about hunting and fishing until the telephone rang, at about 8:30 p. m. At that Andreski said, "Jeepers! Is it that late?" The call was for him. Its purport is unknown but when Andreski returned from the telephone he told France, "I got to go" and he drove away.

The sheriff's next movements are unknown until he appeared at Kopp's tavern, eight miles away, at about 10:40 p. m. He said he had come from Antigo and he asked Kopp for directions on the road to Wausau. Kopp gave them but in a few minutes Andreski re-entered and asked to be redirected. Kopp then described a road which he thought could be found and followed more easily than the one he had first recommended. There was a patron at the bar and the sheriff bought a bottle of beer for him and another for Kopp.

Andreski drank half a bottle himself and left after spending three or four minutes in the place. At about 1:30 the next morning, he and his wrecked car were discovered near Wausau. It appeared that the car, headed toward Wausau, had gone off the road at a curve. The sheriff was unconscious and never regained consciousness although he lived until November 30th. The doctor who was summoned to the hospital testified that in his opinion Andreski was not intoxicated, and that he had made as thorough an examination as Andreski's injuries permitted in order to decide that question.

A hearing on the application for death benefits was held before an examiner of the Industrial Commission who made findings that the injury to Andreski did not occur in the course of his employment nor arise out of it. The examiner also filed a memorandum stating that ". . . in the instant case it is the examiner's conclusion that the purpose of the deceased when he left his office in the courthouse at about 10:30 a. m. November 28, 1948, was not in pursuance of any official duty but was entirely a personal affair. . . . It is primarily for the above reason that the application for death benefit is being dismissed." A review was granted and the commission reached the same conclusion but substituted more detailed findings of fact and memorandum. In the former it stated:

"Based upon these findings the commission concludes that applicant has failed to prove that deceased at the time of injury was performing service growing out of and incidental to employment, and that his injury arose out of employment.

"It is, therefore, found that applicant's injury did not occur while he was engaged in performing service growing out of and incidental to his employment, and that the accident causing injury did not arise out of his employment."

In its memorandum it states the case in support of its order dismissing the application:

"Has applicant shown that her husband was in the course of employment at the time of his injury? The burden of proof is upon her so to establish if death benefit is to be paid. It is required that she establish to a reasonable probability that her husband was performing service incidental to employment at the time of injury. The commission is not allowed to speculate; therefore, if the probability is just as great that he was not performing service incidental to employment the finding must be that his injury did not occur in the course of and arising out of employment. Possibilities and probabilities are to be weighed.

"We think it may be conceded that deceased was in the course of employment up to the time that he left his office at 10:30 a. m. We are convinced, however, that when one, even though subject to call, leaves the place where service is being performed, with no proof as to further activities, there must be a showing that his subsequent activities were related to his work to warrant a finding that he is in the course of employment. The statement made by deceased to the undersheriff that he had 'work to do' might relate to work connected with his duty, or to other activities; might serve as an excuse for denying the undersheriff's request for time off. In our opinion it falls far short of establishing an intention to continue with official work or of establishing just when or where such work was to be done. In any event, whatever the deceased's original intention may have been, his action in staying in a tavern for over six hours is not corroborative of a continuation of assumed official duties, nor does his subsequent conduct bear out a performance of service. Why a sheriff should choose a tavern to receive a phone call in connection with his duties, and why he should wait for six hours for the call (if in connection with his duties) is difficult to fathom. We may admit the possibility of connection. We are unable, however, to convince ourselves to the point of probability that his action was service connected.

"We are aware of the presumption of continuity of service when entry into service has been shown. It is our opinion the presumption does not apply when deceased had left his office. Legally presumptions are usually set up because in the great majority of cases of a given type certain conduct

may be predicated and, therefore, proof may not be required initially on the part of the claiming party. Sheriffs who leave their offices, however, probably leave more often for personal reasons, such as for eating, going home, or personal errands, than they do for business reasons. Following the time that deceased left his office there is no proof of continuation or re-entry into service up to the time of death. That this inability to make proof may, in a meritorious case, deny compensation because of necessity of secrecy as to operations, or for other reason, is true, as it is in the case of other claimants whom the law requires to sustain the burden of proof in order to recover compensation. To hold that police officers, because subject to call, are in the course of employment at all times, unless the contrary is shown, would impose an undue burden on taxpayers because of inability to establish deviation, although, as a matter of common knowledge, such officers spend a good portion of their time in activities not connected with employment."

The position of sheriff is one of great antiquity and honor. He was the deputy of the king in his shire and was accountable to no one but the king to whom he was responsible for the royal levies of men for the army, money for the treasury, and for the preservation of the king's peace, for good order and for justice. Annually, or at shorter intervals, he made a progress throughout his domain, stopping at the more important towns to inquire into all matters of interest to the sovereign. He was accompanied by his court, composed as was the king's court, of representative nobles, freeholders, and burghers, before whom his officers brought persons accused of crime. Trial was had under the supervision of the sheriff and if conviction resulted the sheriff imposed the sentence and executed it. Although in rank some noblemen might be higher, in temporal power and authority within his shire and within his term of office the sheriff was legally superior to them all. He was the representative of the king, accountable only to the king, and the king's authority lay in him.

Within the field of his responsibility for the maintenance of law and order the sheriff today retains his ancient character and is accountable only to the sovereign, the voters of his county, though he may be removed by the governor for cause. No other county official supervises his work or can require a report or an accounting from him concerning his performance of his duty. He chooses his own ways and means of performing it. He divides his time according to his own judgment of what is necessary and desirable but is always subject to call and is eternally charged with maintaining the peace of the county and the apprehension of those who break it. In the performance of this duty he is detective and patrolman, as well as executive and administrator, and he is emphatically one of those who may serve though they only stand and wait. We recite these qualities and characteristics of the office not because they are novel but because they are so old that they are easily forgotten or unappreciated. They do not change legal principles but they do import into controversies factual elements which are not generally present. In this case we do not deal with a subordinate municipal employee who is duplicated over and over but with one who is *sui generis*. His unique powers and obligations make many compensation decisions inapplicable to cases which involve him. The burden of proving that he was engaged in his employment at the time of injury is still upon the applicant even though he may be a sheriff but the evidence sufficient to sustain that burden varies from one case to another, depending upon circumstances.

It appears to have been the impression of the commission that when the sheriff left his office at about 10:30 a. m. on November 28th he entered upon some private pursuit, for its memorandum states, "Sheriffs who leave their offices, however, probably leave more often for personal reasons, . . . than they do for business reasons," and "as a matter of

common knowledge, such officers spend a good portion of their time in activities not connected with employment." Therefore, the commission concluded, "we are aware of the presumption of continuity of service when entry into service has been shown. It is our opinion the presumption does not apply when the deceased had left his office. . . . Following the time that deceased left his office there is no proof of continuation or re-entry into service up to the time of death. . . ." We think undisputed principles were misapplied because the sheriff's functions were misunderstood by the commission. Sec. 59.24, Stats., provides: "Sheriffs and their undersheriffs and deputies shall keep and preserve the peace in their respective counties. . . ." The sheriff's hours of work are such as he deems necessary. So, too, are his methods. Secrecy concerning his purposes, his movements, his whereabouts, are appropriate to his position. Disclosure to others of his activities or intentions is not to be required of him nor its absence held against him. Up to the moment when he left his office in the courthouse it is conceded he was engaged in his employment. He is a police officer whose beat is Marathon county and who may go outside the county without departing from duty. He has records to keep and office work to perform but it cannot be presumed or inferred, from an assumption that sheriffs who leave their offices usually do so for personal reasons, that when he lays aside the office part of his work he has laid aside every part. If he is to perform his duties properly he must do more than sit in his office waiting to be informed. Bearing in mind that his primary duty is to preserve law and order throughout his county, one realizes that it is necessary for him to inform himself of what is going on in the less reputable as well as the more respectable circles. The record shows nothing which Andreski did which a sheriff on duty could not or would not do, nor is there any evidence that what he did was

done for his pleasure or other personal reasons. Having found him performing one part of his duty in his office, we may not speculate that he has turned aside when we find him doing other things which are compatible with his duties although they could in his case or in the case of others be done for different reasons. A rough analogy would be the case of the general manager of a large business, who leaves his private office to take a stroll through the plant, in the course of which he stops to chat and occasionally sits down in one department or another for extended periods. Such conduct in a casual visitor to the plant would support an inference that the visit was for personal reasons but that inference may not be drawn in the case of an officer, part of whose duty is to keep an eye on things.

In *Tewes v. Industrial Comm.* (1928), 194 Wis. 489, 215 N. W. 898, workmen who had commenced their duties at an ice field at night were found drowned there in the morning. We said (p. 494):

"... when it is established that employees have entered upon the performance of their duties and are found at a place where they might properly be in the discharge of those duties, nothing appearing to the contrary, the presumption of continuity obtains, ...

"No one knows the circumstances which induced one or the other or both of the deceased employees to use the automobile. It might have been properly employed in the discharge of their duties, it might have been used for some other purpose. No circumstance points significantly either way. In this situation it is considered that the presumption of the continuity of a state of things once established must prevail."

*Hansen v. Industrial Comm.* (1951), 258 Wis. 623, 46 N. W. (2d) 754, dealt with a claim by the widow of a traveling salesman who was found dead of injuries in the street near a restaurant where he had gone for supper. The commission

denied the claim although it was aware of sec. 102.03 (1) (f), Stats., under which employees whose duties require them to travel are deemed to be performing service at all times while on a trip except when deviating for a private or personal purpose; and by the statute acts reasonably necessary for living or incidental thereto are not regarded as a deviation. The commission considered that it could not speculate as to whether at the time of his injury Hansen was on business, or was performing acts incidental to living, which because of the statute were deemed to be incidental to his employment, or was engaged in a deviation for a private or personal purpose. Therefore, it denied the application for death benefit. Reversing the commission and the learned circuit court, we said (p. 625):

". . . if all that can be learned about the injury from the circumstances and from the testimony of individuals would leave the matter within the realm of speculation, then he must be deemed to be within the scope of his employment. The inference arising from the employment controls unless there is evidence which overpowers that inference."

We follow the same rule here. While in his office the commission concedes Andreski was engaged in his employment. That being established, the presumption of continuity attaches and remains with him until severed by some occurrence inconsistent with the terms and conditions of his employment. No such inconsistency has been shown here. The inference arising from the established employment must control when no more can be brought to overpower it than speculation based upon behavior that is as consistent with continuance of duty as it is of departure from it.

We conclude that the finding of the commission that Andreski's injury did not occur while he was engaged in performing service growing out of and incidental to his employment and that the accident causing injury did not arise

out of his employment is contrary to the evidence and to the reasonable inferences therefrom. Accordingly, in so finding the Industrial Commission acted without and in excess of its powers, and the judgment of the circuit court confirming the commission's order based on such finding must be reversed.

*By the Court.*—Judgment reversed and cause remanded for further proceedings consistent with this opinion.

FAIRCHILD, J. (*dissenting*). Viewed from the standpoint most favorable to the applicant widow, it would seem that this is a case where the commission might draw different inferences from evidentiary facts, and that the finding of the commission based upon an inference that is reasonably supported by the evidence cannot be disturbed by the courts on review.

In *Ebner v. Industrial Comm.* (1948), 252 Wis. 199, 201, 31 N. W. (2d) 172, this court stated:

"And if the facts are not in dispute, but permit of drawing a different inference therefrom, a question of fact and not a question of law is presented and the commission's finding thereon will be sustained. *Eckhardt v. Industrial Comm.* 242 Wis. 325, 329, 7 N. W. (2d) 841; *Green Valley Co-op Dairy Co. v. Industrial Comm.* 250 Wis. 502, 27 N. W. (2d) 454."

It has been repeatedly held that the burden of proof is on the compensation claimant. *Milwaukee E. R. & L. Co. v. Industrial Comm.* (1936), 222 Wis. 111, 114, 267 N. W. 62; *Bowen v. Industrial Comm.* (1941), 239 Wis. 306, 311, 1 N. W. (2d) 77; *Skelly v. Industrial Comm.* (1949), 254 Wis. 315, 319, 36 N. W. (2d) 58; *McCune v. Industrial Comm.* (1952), 260 Wis. 499, 504, 50 N. W. (2d) 683.

The presumption which the majority credit with a dominant influence is not fixed and final. There is evidence which destroys its effectiveness and puts upon the claimant the necessity of producing evidence to support her claim. The

length of time during which Andreski was completely disassociated with any service connected with his official capacity has probative value to show that he was indulging in his "day off" habit at the place where it was his custom to indulge in private unofficial relaxation. The facts showing a plan, intention, and purpose to entertain himself, using his private car and visiting with friends are set forth in the opinion of the trial judge and the findings of the commission. The undisputed facts which would support an inference, which inference in turn would support a finding by the commission that Andreski was not performing service growing out of and incidental to his employment at the time of his injury are:

(1) That several times prior to Saturday, November 28, 1948, Andreski had visited the France tavern for purposes of personal recreation.

(2) That there is no evidence that Andreski, when he left his office late in the morning of November 28th, started out on a trip incidental to the performance of his duties of sheriff.

(3) The long interval of time (six hours) that elapsed during which Andreski was at the France tavern.

(4) That after leaving the France tavern Andreski proceeded to Antigo which is located in Langlade county, although his jurisdiction as sheriff extended only to the limits of Marathon county.

The facts were considered as proof and as showing a basis for a proper inference, and it seems to me there is no question about the relevancy and materiality of such evidence. The course of conduct of the deceased is certainly of probative value. The showing made points to the existence in the mind of the sheriff of a deliberate purpose to conduct himself unofficially in a manner satisfactory to him. The commission correctly found in its decision that it is common knowledge that sheriffs often leave their offices for personal reasons,

such as for eating, going home, and doing personal errands. The conduct of Andreski was proved to be of an unofficial nature, and such proof leads to and warrants the inferences drawn by the commission and by the circuit court.

The majority opinion cites the decision of *Hansen v. Industrial Comm.* (1951), 258 Wis. 623, 46 N. W. (2d) 754, involving the fatal injuries of a traveling salesman occurring near a restaurant where he had gone for supper, in which the court based its decision on sec. 102.03 (1) (f), Stats., which provides:

"Every employee whose employment requires him to travel shall be deemed to be performing service growing out of and incidental to his employment at all times while on a trip, except when engaged in a deviation for a private or personal purpose. Acts reasonably necessary for living or incidental thereto shall not be regarded as such a deviation. Any accident or disease arising out of a hazard of such service shall be deemed to arise out of his employment."

We fail to see where such statute has any application to the present case. In *Hansen v. Industrial Comm., supra,* said section is referred to as "the traveling salesmen's provision of the statutes," and it does not apply to all employees required to perform some services outside of an office, store, or factory. Even if Andreski's duties required him to travel about the county, it was not the sort of travel that comes within the purview of the "traveling salesmen's provision" of the statutes, a section obviously limited to cases of employees temporarily "living away from home." *Hansen v. Industrial Comm., supra,* at page 627. Moreover, even if this "traveling salesmen's provision" could be construed as applicable to a person whose work might entail the occasional use of an automobile, it obviously would have no application to an employee while on a personal errand. In the present case, since it was not established that Andreski was

injured while on a business trip for his employer, the section could have no possible application.

Where sec. 102.03 (1) (f), Stats., applies, the burden is on the employee to show that he was "performing service growing out of and incidental to his employment." The presumption of this section, that the employee is acting within the scope of his employment, is overpowered by the evidence.

For these reasons the judgment of the circuit court affirming the order of the commission dismissing plaintiff's application for compensation should be affirmed.

I am authorized to state that Mr. Chief Justice FRITZ and Mr. Justice CURRIE join in this dissent.